UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DANIEL DURAN, | ) |
| | ) |
| Plaintiff(s), | ) |
| | ) |
| vs. | ) Case No. 4:08CV1400 JCH |
| | ) |
| CHRISTOPHER ANDREW, | ) |
| | ) |
| Defendant(s). | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment, filed March 15, 2010. (Doc. No. 80). The matter is fully briefed and ready for disposition.

**BACKGROUND**

The American Soybean Association ("ASA") is a membership based organization, representing United States soybean farmers since 1920 and conducting international marketing activities for at least fifty years. (Defendant's Rule 56.1 Statement ("Defendant's Facts"), ¶¶ 2, 3). Defendant Christopher Andrew was hired by ASA in 1998, for the position of Regional Director for the Middle East and Africa, based in Istanbul, Turkey. (Id., ¶ 5). The United Soybean Board ("USB") was created in 1991. (Id., ¶¶ 2, 4). According to Defendant, the function of USB is to administer the allocation of national soybean checkoff dollars, and it has the authority to issue contracts for the marketing of U.S. soybeans. (Id., ¶ 4).

The United States Soybean Export Council ("USSEC") is a not-for-profit organization incorporated in the State of Delaware, with its principal place of business in St. Louis, Missouri. (Defendant's Facts, ¶ 2). According to Defendant, USSEC was created in 2005 as a joint venture

between ASA and USB, in order to undertake international marketing ("IM") activities. (Id.).[1] Plaintiff Daniel Duran was hired as the first Chief Executive Officer ("CEO") of USSEC at its inception in 2005. (Id., ¶ 1). In 2005, Defendant became an employee of USSEC, with the same position and job responsibilities as he previously held with ASA. (Id., ¶ 6).

According to Defendant, in or around September, 2007, a dispute arose between Plaintiff and the USSEC Istanbul Office regarding the issuance of new contracts to Istanbul local staff. (Defendant's Facts, ¶ 11). Defendant submitted to Plaintiff calculations for the new staff salaries, allegedly based on the U.S. State Department Foreign Service National ("FSN") tables. (Id.).[2] In 2007, Turkey was experiencing a significant amount of inflation, and therefore the FSN tables, calculated in local currency, represented a substantial increase over the prior year. (Id., ¶ 12). Defendant maintains Plaintiff refused to follow the tables, and thus no new contracts were issued and Istanbul staff members continued to work without contracts at their prior salary levels. (Id., ¶¶ 12, 13).[3] Defendant maintains it was only after the Foreign Agriculture Service ("FAS") of USDA conducted an audit of the Istanbul Office and issued a finding that local law must be followed that Plaintiff finally acceded to the issuance of new contracts at the appropriate amounts. (Id., ¶ 14).[4]

---

[1] Plaintiff describes USSEC as follows: "USSEC is a partnership of soybean producers, allied agribusinesses and agricultural organizations. It has a global network of international offices and operates overseas as the American Soybean Association-International Marketing (ASA-IM). It conducts marketing activities and provides technical assistance throughout the global soybean value chain." (First Amended Complaint, ¶ 5).

[2] Defendant maintains the FSN tables had been followed by USSEC since its inception in 2005, and by ASA prior to that time. (Defendant's Facts, ¶ 11).

[3] Defendant asserts Plaintiff's failure to issue the new contracts and pay appropriate wages constituted violations of Istanbul local law, Turkish labor law, and U.S. regulations, and further led to a significant decrease in the morale of the Istanbul office. (Defendant's Facts, ¶ 12).

[4] Plaintiff conversely maintains FAS issued only an "Exit Note," not an audit finding, stating as follows: "While this review revealed substantial ambiguity regarding USSEC's obligation to grant employee pay increases according to the FSN Compensation Plan provided by the U.S. Embassy in

On May 27, 2008, USSEC Japan Country Director and Japanese national Tom Nishio wrote the following e-mail to the USSEC Chairman and Treasurer:

> Subject: Extremely confidential: Unable to operate Japan office
>
> Dear Mr. Mark Pietz, Chairman, USSEC:
> Dear Mr. Rick Ostlie, Treasurer, USSEC:
>
> Sub: Impossible carrying on my duty to professionaly[5] operate ASA-IM Japan office and the name of ASA-IM Japan is been damaged
>
> I am writing this letter only to Mark and Rick because of its sensitivity. This matter needs to be held in the utmost confidence and please do not share this with anyone else (farmer leaders or staff) until I have a chance to meet you in person.
>
> It is my great regret to disclose you what has what has been happening in our organization but I desperately need your recognition and support to this matter in order for me to continue conducting my duties and responsibilities as Japan Country Director and for all of us to prevent further damages and staining the reputation of the name of ASA-IM which has been built up over the half a century in Japan.
>
> The unexpected but disastrous situation that I am confronted is the affair between Mr. Dan Duran, CEO of USSEC, and Miss Masako Masi Tateishi, my staff who is in charge of soyfood marketing. Their intimate and immoral relationship were witnessed by me at Marriot Ohare International Hotel in Chicago on April 21 and 22, 2008. And their private conversation and direct communications by emails I have obtained make me great disappointment to both individuals, particularly to the qualification of the person to be sitting on the chair of CEO position.
>
> What he has been doing to ASA-IM Japan can be simply worded as "unprofessional", "immoral", "no dignity", jeopardizing the Japan team which I have spent so many years to build up", "putting his individual lust over business", "encouraging my staff to ignore the Japan Country Director", "leading to misuse of USB and FMD funds", and "creating a big scandal in soy food industries in both Japan and the U.S. to stain the name of American Soybean Association-International Marketing".
>
> So far I have not disclosed what I have witnessed and obtained to the both individuals but it seems Masi has sensed I have come to notice some unusual relationship between the two so that she has started to communicate with some customers in the industry

---

Turkey, we have decided to grant them nonetheless." (Plaintiff's Responses to Defendant's "Rule 56.1 Statement" ("Plaintiff's Response to Defendant's Facts"), ¶ 14).

[5] The Court has not corrected misspellings and grammatical errors in Mr. Nishio's e-mail.

- 3 -

that she was in danger of loosing her job due to some unreasonable reasons that she made up which are totally nonsense. It can be said that her action has been fully recognized by Dan Duran and that her action is to create the environment in the industry to protect herself in the future. I assume the reason why she can take such a strong action is because she is fully convinced that Dan will protect her from dismissing in the event that I take an action to her.

Under this situation, I can no longer perform my professional duty in Japan and am ready to fly to the U.S. to explain and show evidences I have managed to obtain. Since my customers are being involved, the urgent action is required to protect the damage to the name of ASA-IM. I will phone each of you either today or tomorrow to give your further explanations and discuss when and where to meet privately and confidentially with me in the U.S.

I am going to fly to the US with my own expenses and tell my staff I will take some holidays. My hope is to meet both of you at the one place at the same time as soon as possible, such as Chicago on June 5 to 8, but I will go to anywhere and anytime you wish me to go because its importance and urgency.

(Defendant's Facts, ¶¶ 17, 21, quoting Defendant's Exh. F). Defendant received a copy of Nishio's e-mail the day after it was sent, and further learned that Nishio had spoken to board members Mark Pietz and Rick Ostlie regarding his allegations. (Id., ¶ 22). Knowing that Nishio was bringing concerns to the board, Defendant resolved to send an e-mail to the farmer leadership of USSEC, outlining his own concerns with Plaintiff's stewardship of USSEC. (Id.)

On June 3, 2008, Defendant sent a letter to the USSEC Board[6], outlining the history of the staff salaries issue and certain other decisions by Plaintiff as they pertained to the Istanbul office. (Defendant's Facts, ¶ 23, citing Defendant's Exh. I). The June 3, 2008, letter made no mention of the allegations by Nishio, or any other reference to an inappropriate relationship between Plaintiff and Ms. Tateishi. (Id.).

---

[6] Defendant maintains he also forwarded the letter to "USSEC international marketing committees." (Defendant's Facts, ¶ 23). Plaintiff denies that any such committees exist. (Plaintiff's Response to Defendant's Facts, ¶ 23).

According to Defendant, on June 6, 2008, the USSEC Executive Committee held a meeting via conference call, and voted to conduct an investigation into the allegations against Plaintiff. (Defendant's Facts, ¶ 27). On or about June 8, 2008, Defendant sent private[7] e-mails to Plaintiff, encouraging him to resign his position as USSEC CEO in light of the investigation and its impending turmoil on the organization. (Id., ¶ 28).

On June 11, 2008, Defendant contacted USSEC attorneys Alex Menendez and Christopher Salisbury, from the law firm McLeod, Watkinson & Miller ("MWM"), and indicated that he had no personal knowledge regarding the allegations made by Nishio. (Defendant's Facts, ¶ 29). Defendant did provide Salisbury and Menendez with second-hand information regarding a potential *quid pro quo* claim of sexual harassment by a USSEC St. Louis staff member, and Plaintiff's alleged issuance of non-bid contracts in violation of company policy. (Id., ¶ 30).

On June 12, 2008, Defendant received a forwarded e-mail indicating that he had been terminated from his position as USSEC Middle East Regional Director. (Defendant's Facts, ¶ 32).[8] On June 13, 2008, Defendant sent the following e-mail to Plaintiff, the USSEC St. Louis staff, the Istanbul staff, and USSEC foreign office directors:

> Dan,
>
> Do yourself and everyone else a big favor and resign unconditionally effective immediately. You're out of your league, over your head, out of your depth and have none of the background, education or experience to ever grow into your job. You obviously have no idea what you're doing and never will. (The ability to create an atmosphere of terror and suspicion doesn't count). You aren't and never will be CEO

---

[7] Although Plaintiff denies the June 7, and 8, 2008, e-mails were sent privately to Plaintiff, he offers no evidence they were directed to other people. (Plaintiff's Response to Defendant's Facts, ¶ 28).

[8] Plaintiff alleges Defendant was terminated, "for transmitting provably false statements of fact via numerous e-mails to Plaintiff and others and for failure to comply with his management[] duties, including failure to communicate with his superiors." (First Amended Compl., ¶ 6).

material. This was more than obvious from the beginning. The fact that you've lasted this long is just amazing and has caused nothing but embarrassment, including the most recent scandals, which would suggest that advising you to disappear quickly, quietly and amicably, with the least amount of publicity, is not "extortion," but is rather about the kindest, most sensible and friendliest advice that anyone could possibly give you.

And feel free to pass this to any board members, farmers, lawyers, staff, etc. you feel like. The truth is the truth. And more seems to be coming out all the time. We're just at the tip of the iceberg.

(Id., ¶ 33, quoting Defendant's Exh. K). Defendant further sent another communication to the USSEC St. Louis staff, contained within an e-mail string, as follows:

All, Please read this below and please come forward with any info. Do not be afraid because of the problems I am having with Dan. They are unrelated. I'm am (sic) being accused of "extortion," specifically telling his wife about his girlfriend. This not only never happened but I'm at a loss as to how that would meet the definition of "extortion." The wife and girlfriend may find out about each other and meet somehow, someday but it won't have anything to do with me. Anyway, I would urge you all to call the lawyers below with any info related to ***sexual harassment/hostile workplace environment***. Even sexual harassment cover ups are a ***federal violation***. Do not be afraid. Do the right thing. Be honest.

Look how many good people are disappearing...Mitzi, Swick, Bridget, me, others...coincidence?

(Id., ¶ 34, quoting Defendant's Exh. L (emphasis in original)).

Defendant retained counsel in Turkey, and commenced a wrongful termination claim against USSEC on or about June 24, 2008. (Defendant's Facts, ¶ 35). According to Defendant, USSEC maintained untenable positions during his repatriation process, in an attempt to gain a strategic advantage and coerce Defendant into ceasing his e-mail communications with USSEC personnel. (Id.). On July 7, 2008, Defendant e-mailed the USSEC board and committee members, complaining about his treatment and the repatriation process. (Id., ¶ 36). He included correspondence between Defendant's Turkish counsel and USSEC's Turkish counsel, as well as communications between USSEC's U.S. and Turkish counsel. (Id.). In his e-mail, Defendant referenced both Plaintiff's "utter

disregard for complying with US law as it related to operating in foreign countries," and his "extra-marital affair with a staff member in Mr. Nishio's Tokyo office." (Defendant's Exh. M).

On July 24, 2008, Kris Schuster, HR Representative for USSEC, sent a memorandum to Tom Nishio confirming that his contract would not be renewed, and relieving him of his duties during the remainder of his existing contract.[9] (Defendant's Facts, ¶ 39, citing Defendant's Exh. N). The memorandum indicated the reason for the decision was Nishio's "inappropriate managerial actions and communications resulting in significant organizational impact for the USSEC office in Japan." (Defendant's Exh. N).[10] Defendant learned of Nishio's termination on or about July 20, 2008. (Defendant's Facts, ¶ 41). He composed an e-mail to the USSEC leadership on July 23, 2008, in which he discussed both the treatment of Nishio and himself, and the integrity of MWM and its investigation. (Id., citing Defendant's Exh. P).

On August 5, 2008, outgoing USSEC Chairman Mark Pietz issued a statement regarding the investigation conducted by MWM, as follows:

> On behalf of the United States Soybean Export Council, I am pleased to share that the Board's thorough investigation of the allegations made against our CEO, Dan Duran, has affirmed our full confidence in the CEO. The investigation focused on charges raised by certain individuals relating to the performance and conduct of Mr. Duran. Some of you may be familiar with these charges based on the numerous e-mail transmissions that have been forwarded by a former employee to numerous individuals and organizations in the soy industry.
>
> As an organization USSEC is required by law and is committed to fully investigate any serious charges relating to the workplace environment and/or compliance with the Act and the Order. That is what we did in this instance. The investigation yielded no findings to substantiate the allegations brought to the

---

[9] Defendant asserts Schuster sent the memorandum at Plaintiff's behest. (Defendant's Facts, ¶ 39).

[10] Specifically, Schuster faulted Nishio for independently deciding to change the position of Ms. Tateishi, without prior consultation and approval from Plaintiff, and for publishing disparaging information regarding Ms. Tateishi via e-mail and the USSEC Japan website. (Defendant's Exh. N).

> attention of the Board by those individuals, which leaves no doubt that they where (sic) without substance or support.
>
> USSEC's diligence in quickly and thoroughly pursuing and completing this investigation has put it in a position to now close this matter. We look forward to moving forward with Dan Duran as the USSEC CEO, and anticipate a bright future for marketing U.S. soybeans in international markets.

(Defendant's Facts, ¶ 44, quoting Defendant's Exh. Q). On or about September 3, 2008, Defendant forwarded a copy of Nishio's May 27, 2008, e-mail to the USSEC leadership and other allegedly interested parties. (Id., ¶ 48, citing Defendant's Exh. R).

Plaintiff filed his original Complaint in this matter on September 15, 2008. (Doc. No. 1). In Count I of his First Amended Complaint, filed December 1, 2008, Plaintiff seeks a permanent injunction prohibiting Defendant from publishing and/or re-publishing by any means further defamatory, scandalous, desultory, false statements concerning Plaintiff, Plaintiff's personal life, and Plaintiff's professional activities. (Doc. No. 16, P. 5). Plaintiff further asserts Defendant is liable for defamation (Count II), and injurious falsehood (Count III). (Id., PP. 5-7). As stated above, Defendant filed the instant Motion for Summary Judgment on March 15, 2010, asserting there exist no genuine issues of material fact and Defendant is entitled to judgment as a matter of law. (Doc. No. 80).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Id. at 249.

### **DISCUSSION**[11]

"Under Missouri law, in a defamation claim, a plaintiff must establish: 1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation.[12]" Allen v. ASRC

---

[11] Under Missouri law, defamation analysis applies to the tort of injurious falsehood. State ex rel. Diehl v. Kintz, 162 S.W.3d 152, 156 n. 4 (Mo. App. 2005); BPSS, Inc. v. Wilhold, 2009 WL 736693, *5 (E.D. Mo. Mar. 18, 2009). The Court's rulings with respect to Plaintiff's defamation claims thus apply with equal force to his injurious falsehood claims.

[12] Missouri law requires plaintiffs to prove reputational harm in defamation cases before allowing recovery for related injuries, such as emotional distress. Kenney v. Wal-Mart Stores, Inc., 100 S.W.3d 809, 813 (Mo. banc 2003). In his Motion for Summary Judgment, Defendant asserts Plaintiff's claims of defamation necessarily fail, because he cannot establish reputational harm or actual damages. (Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Defendant's Memo in Support"), PP. 13-19). Among other things Defendant maintains that USSEC board members held Plaintiff in low regard prior to Defendant's dissemination of allegedly defamatory materials, and that no board member's opinion was diminished as a result of such

Communication, 2010 WL 1404179, *2 (E.D. Mo. Apr. 8, 2010) (internal quotations and citations omitted); see also State ex rel. BP Products North America Inc. v. Ross, 163 S.W.3d 922, 929 (Mo. banc 2005). A person publishes a defamatory statement by communicating it to a third person. Gray v. AT&T Corp., 357 F.3d 763, 765-66 (8th Cir. 2004). Communication of defamatory matter only to the plaintiff, who then discloses it to third parties, ordinarily does not subject the defendant to liability. Overcast v. Billings Mutual Ins. Co., 11 S.W.3d 62, 70 (Mo. banc 2000). Furthermore, "communications between officers of the same corporation in the due and regular course of the corporate business, or between different offices of the same corporation are not publications to third persons." Gray, 357 F.3d at 766 (internal quotations and citations omitted). "Defamatory statements made by company officers or supervisors to non-supervisory employees constitute a publication for purposes of a defamation action." Rice v. Hodapp, 919 S.W.2d 240, 243 (Mo. banc 1996) (citations omitted).

When reviewing allegedly libelous statements to determine whether a plaintiff can survive summary judgment, there are two primary components. "First, the court must determine whether the statement is capable of having a defamatory meaning." Ribaudo v. Bauer, 982 S.W.2d 701, 704 (Mo. App. 1998) (citation omitted). Whether a statement is defamatory and actionable is a question of law. Kintz, 162 S.W.3d at 155. In making this determination, "the words must be stripped of any pleaded innuendo and construed in their most innocent sense." Id. (citation omitted). "The alleged

---

dissemination. (Id.). Plaintiff counters that at least one USSEC board director held Plaintiff in lower regard, and that the relationship between Plaintiff and his employer was "seriously disrupted," both as a result of Defendant's defamatory statements. (Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, PP. 16-18). Upon consideration, the Court finds a genuine issue of material fact remains with respect to whether Plaintiff suffered reputational harm, and if so, whether it resulted from Defendant's conduct, sufficient to deny both this portion of Defendant's Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment in its entirety.

defamatory words must also be considered in context, and the words are given their plain and ordinarily understood meaning." Id. (citation omitted).[13]

Second, if the statements are capable of a defamatory meaning, the Court then must inquire whether one or more privileges shelter the defendant from legal action.[14] Ribaudo, 982 S.W.2d at 704. Statements of opinion are accorded absolute privilege under the First Amendment, even if they are made maliciously or insincerely. Id. Missouri recognizes one exception to this general rule, however, "when the statement of opinion implies the existence of undisclosed defamatory facts." Id. (citation omitted). "The test for an ostensible opinion is whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact." Kintz, 162 S.W.3d at 155 (citation omitted). In order to make this determination, the Court examines the totality of the circumstances to decide whether the ordinary reader would have treated the statement as opinion. Ribaudo, 982 S.W.2d at 705.

> A charge of specific criminal conduct would be a statement of fact. A statement that refers to criminal conduct must be examined in context in order to determine whether the reader would be left with the impression that the plaintiff was being accused of a crime or that the defendant disagreed with the plaintiff's conduct and used pejorative statements or vituperative language to indicate his or her disapproval.

Diez v. Pearson, 834 S.W.2d 250, 252 (Mo. App. 1992) (citations omitted). The question of whether a statement is pure opinion or an assertion of fact is one of law.[15] Ribaudo, 982 S.W.2d at 705.

---

[13] "If the statement is capable of a defamatory meaning, then a plaintiff can survive summary judgment on that issue and the jury must determine if the statement did, indeed, have a defamatory meaning." Ribaudo, 982 S.W.2d at 704 (citation omitted).

[14] Truth may be asserted as an absolute defense. Boone v. Wal-Mart Stores, Inc., 2009 WL 1035343, *4 (E.D. Mo. Apr. 16, 2009).

[15] Again, if the Court determines the statement is capable of being understood as a factual assertion, "the question of whether it was actually understood as such is one for the jury." Pape v. Reither, 918 S.W.2d 376, 379 (Mo. App. 1996) (citations omitted).

Finally, "[a] communication is qualifiedly privileged if it is made in good-faith upon a subject matter which the declarant has an interest or in reference to which he has a duty, to a person having a corresponding interest or duty, even though it contains matter which absent such privilege would be actionable." Allen, 2010 WL 1404179, *2 (citation omitted).

> If a defendant establishes a qualified privilege a plaintiff can overcome it by proving by clear and convincing evidence that either (1) the defendant made the defamatory statement in bad-faith or with actual malice, or (2) that the statement made exceeded the requirements of the situation. To prove actual malice the plaintiff must show the statement was made with knowledge that it was false or with reckless disregard for the truth at a time when the defendant had serious doubts as to whether it was true.

Id., *3 (citations omitted). Whether the circumstances give rise to a qualified privilege is generally a question for the Court. Hellesen v. Knaus Truck Lines, Inc., 370 S.W.2d 341, 345 (Mo. 1963). "[I]f a fact issue is raised on the existence of good faith or malice, or on whether or not the statements made exceed the exigencies of the situation so as to constitute an abuse of the privilege, such fact questions are for the jury." Id. (citations omitted).

With these standards in mind, the Court turns to a consideration of the alleged defamatory statements at issue here.[16]

### A.  June 3, 2008 Letter

As stated above, on June 3, 2008, Defendant sent a letter to the USSEC Board and others, outlining the history of the staff salaries issue and certain other decisions by Plaintiff as they pertained to the Istanbul office. (Defendant's Facts, ¶ 23, citing Defendant's Exh. I). Upon consideration, the Court finds that even assuming this letter was both defamatory and published, the communication nevertheless is protected as opinion under the First Amendment, for several reasons. First, the tenor

---

[16] The Court's job was complicated by the manner in which the parties submitted their exhibits and organized their briefs. Therefore, any communications not specifically addressed in this Order remain pending, subject to subsequent rulings on motions in limine.

of the communication as a whole is not objective; rather, Defendant appears to take issue with Plaintiff's behavior mainly as it relates to him. Ribaudo, 982 S.W.2d at 705. Defendant further uses qualifying language on several occasions, such as "I am at a loss to explain," "situations that lead me to question his judgment and ability," and "I speak only for myself..." Id. Finally, the statements do not charge Plaintiff with a specific crime; rather, they include only "inferences which cannot objectively and realistically be proven true or false." Diez, 834 S.W.2d at 252-53.[17] This portion of Defendant's Motion for Summary Judgment will therefore be granted.

### B. June 7, and June 8, 2008 E-Mails

On June 7, 2008, Defendant sent Plaintiff an e-mail with the subject line "resign unconditionally 'effective immediately'", and the text "'effective immediately.'" (Doc. No. 1-5, P. 2). On June 8, 2008, Defendant sent Plaintiff an e-mail with the subject line "perhaps a MUCH more graphic mass memo would do it?", and the text "unconditionally, 'effective immediately.'" (Id., P. 3). That same day, Defendant sent Plaintiff an e-mail with the subject line "you're down to just hours....", and the following text:

> ....before things become irreversible.
>
> You know all you've done, so you know all that you wouldn't want to come to light (and it all will, in just hours, believe it).
>
> You still have a few hours to resign quickly, quietly and amicably ("internally"). You must realize that you have absolutely no chance of surviving an investigation...
>
> But it's decision time.
>
> The choice is yours.

---

[17] It is not even clear from Defendant's communication whether the laws claimed to have been violated are unspecified criminal laws, or merely civil labor and contract laws. Diez, 834 S.W.2d at 253. As a result, the Court finds the statements too imprecise to be actionable. Id. ("The use of strong language to show disapproval will not make the words actionable.").

> I trust that you do understand that this is it.
>
> Resign now, "unconditionally, effective immediately" and that will be it, as soon as I see those words. And I always keep my word including all those above.

(Id., P. 4). Finally, on June 8, 2008, Defendant sent Plaintiff an e-mail with the following subject line and text: "...think in terms of federal offenses..." (Id., P. 5).

In his Motion for Summary Judgment, Defendant asserts these e-mails cannot constitute publications for defamation purposes, because they were sent only to Plaintiff. (Defendant's Memo in Support, PP. 6-7). Plaintiff offers no evidence they were directed to other people, and the Court agrees Defendant is not subject to liability for his communication of allegedly defamatory matter only to Plaintiff. Overcast, 11 S.W.3d at 70. Defendant's Motion for Summary Judgment as it pertains to the above-described e-mails will therefore be granted.[18]

### C. June 13, 2008 E-Mail Number One

As stated above, on June 13, 2008, Defendant sent the following e-mail to Plaintiff, the USSEC St. Louis staff, the Istanbul staff, and USSEC foreign office directors:

> Dan,
>
> Do yourself and everyone else a big favor and resign unconditionally effective immediately. You're out of your league, over your head, out of your depth and have none of the background, education or experience to ever grow into your job. You obviously have no idea what you're doing and never will. (The ability to create an atmosphere of terror and suspicion doesn't count). You aren't and never will be CEO material. This was more than obvious from the beginning. The fact that you've lasted this long is just amazing and has caused nothing but embarrassment, including the most recent scandals, which would suggest that advising you to disappear quickly, quietly and amicably, with the least amount of publicity, is not "extortion," but is rather about the kindest, most sensible and friendliest advice that anyone could possibly give you.

---

[18] The above reasoning applies to preclude introduction of any other e-mails or communications sent strictly to Plaintiff.

- 14 -

> And feel free to pass this to any board members, farmers, lawyers, staff, etc. you feel like. The truth is the truth. And more seems to be coming out all the time. We're just at the tip of the iceberg.

(Defendant's Facts, ¶ 33, quoting Defendant's Exh. K). In his Motion for Summary Judgment, Defendant first asserts the e-mail does not constitute a publication, because it was not sent to board members or others who then held Plaintiff in lower regard. (Defendant's Memo in Support, P. 7). Upon consideration, the Court finds no such requirement; rather, under Missouri law a person publishes a defamatory statement simply by communicating it to a third person. Gray, 357 F.3d at 765-66. Under this standard, there is no question that Defendant published the June 13, 2008, e-mail communication.[19]

Defendant next asserts the communication is accorded absolute privilege under the First Amendment, as a statement of opinion. (Defendant's Memo in Support, P. 8). Defendant maintains the e-mail clearly represents vitriolic hyperbole, sent as it was within hours of Defendant's learning of his termination. (Id.).

In examining the totality of the circumstances in which the e-mail was published, the Court agrees no reasonable factfinder could conclude the statements therein implied assertions of objective fact. See Henry v. Halliburton, 690 S.W.2d 775, 787-788 (Mo. banc 1985); Kintz, 162 S.W.3d at 155. Rather, statements such as, "You're out of your league, over your head, out of your depth and have none of the background, education or experience to ever grow into your job," "You obviously have no idea what you're doing and never will," and "You aren't and never will be CEO material," are mere inferences, "which cannot objectively and realistically be proven true or false." Diez, 834

---

[19] As further support for its ruling, the Court finds a fact question remains as to whether board members and/or others lowered their opinion of Plaintiff after viewing Defendant's e-mail.

S.W.2d at 252-53. The statements thus are protected by the First Amendment, and this portion of Defendant's Motion for Summary Judgment must be granted.

### D. June 13, 2008 E-Mail Number Two

On or about June 13, 2008, Defendant admittedly sent another communication to the USSEC St. Louis staff, contained within an e-mail string, as follows:

> All, Please read this below and please come forward with any info. Do not be afraid because of the problems I am having with Dan. They are unrelated. I'm am (sic) being accused of "extortion," specifically telling his wife about his girlfriend. This not only never happened but I'm at a loss as to how that would meet the definition of "extortion." The wife and girlfriend may find out about each other and meet somehow, someday but it won't have anything to do with me. Anyway, I would urge you all to call the lawyers below with any info related to ***sexual harassment/hostile workplace environment***. Even sexual harassment cover ups are a ***federal violation***. Do not be afraid. Do the right thing. Be honest.
>
> Look how many good people are disappearing...Mitzi, Swick, Bridget, me, others...coincidence?

(Defendant's Facts, ¶ 34, quoting Defendant's Exh. L (emphasis in original)).

In his Motion for Summary Judgment, Defendant again asserts the e-mail at issue does not constitute a publication, because it was not sent to Board members who then held Plaintiff in lower regard. (Defendant's Memo in Support, P. 7). As discussed in Section (C), supra, the Court finds the communication was published under Gray, and a fact question remains as to whether board members and/or others' opinion of Plaintiff suffered as a result of viewing the e-mail. This portion of Defendant's Motion for Summary Judgment will therefore be denied.

### E. July 7, 2008 E-Mail

As noted above, on July 7, 2008, Defendant e-mailed the USSEC board and committee members, complaining about his treatment and the repatriation process. (Defendant's Facts, ¶ 36). He included correspondence between Defendant's Turkish counsel and USSEC's Turkish counsel, as well as communications between USSEC's U.S. and Turkish counsel. (Id.). In his e-mail,

Defendant referenced both Plaintiff's "utter disregard for complying with US law as it related to operating in foreign countries," and his "extra-marital affair with a staff member in Mr. Nishio's Tokyo office." (Defendant's Exh. M).

In his Motion for Summary Judgment, Defendant again asserts the statements in his July 7, 2008, e-mail are protected as opinion. (Defendant's Memo in Support, P. 9). Upon consideration, the Court agrees the majority of the communication is protected under the First Amendment. As with the June 3, 2008, e-mail message, the tenor of the communication as a whole clearly is not objective; rather, Defendant obviously is perturbed, and even references litigation he had commenced against USSEC in Turkey, alleging wrongful termination. Further, although Defendant accuses USSEC management and counsel of, among other things, "brazenly disregard[ing] all protocols, laws, [and] regulations," the Court finds that taken in context, these allegedly defamatory statements constitute privileged opinion, as they express only Defendant's interpretation of Plaintiff's and the organizations's conduct in terminating his employment. Diez, 834 S.W.2d at 252. As above, it is not clear whether the laws claimed to have been broken are unspecified criminal laws, or merely civil labor and contract laws. Id. at 253. As a result, the statements cannot be found to charge Plaintiff with a specific crime, and thus are too imprecise to be actionable. See Id. (citation omitted) ("The use of strong language to show disapproval will not make the words actionable."). See also Henry, 690 S.W.2d at 788-90.

Toward the end of his July 7, 2008, e-mail, however, Defendant states as follows: "It appears that management and counsel were able to successfully whitewash the scandal and turmoil created by CEO Dan Duran in his extra-marital affair with a staff member in Mr. Nishio's Tokyo office." (Defendant's Exh. M). Upon consideration, the Court finds this statement is distinguishable, as it "implies the existence of undisclosed defamatory facts." Ribaudo, 982 S.W.2d at 704 (citation

omitted). In other words, a reasonable factfinder could conclude the allegation of an extramarital affair implies an assertion of objective fact. Kintz, 162 S.W.3d at 155. The question of whether it actually was understood as such must therefore be left to the jury.[20] Pape, 918 S.W.2d at 379.

Defendant's Motion for Summary Judgment as to the July 7, 2008, e-mail is granted in part and denied in part, in accordance with the foregoing.[21]

### F. July 23, 2008 E-Mail

As noted above, on July 23, 2008, Defendant composed an e-mail to the USSEC leadership, in which he discussed both the treatment of Nishio and himself, and the integrity of MWM and its investigation. (Defendant's Facts, ¶ 41, citing Defendant's Exh. P). Upon consideration, the Court will treat this missive as it did Defendant's July 7, 2008, communication. In other words, Defendant's Motion for Summary Judgment as to the majority of the communication will be granted, as Defendant's opinions regarding Plaintiff's "egregious behavior," and "poor moral character" are protected under the First Amendment.[22] Defendant again references Plaintiff's alleged affair in the e-mail, however, as follows:

> It took great courage on the part of Mr. Nishio to come forward with the information about CEO Dan Duran's immoral and unprofessional conduct, namely, conducting an illicit extramarital affair with a member of Mr. Nishio's

---

[20] As noted above, falsity is an element of a prima facie defamation claim. Allen, 2010 WL 1404179, *2. Thus, in order to succeed Plaintiff ultimately will have to prove Defendant's assertions regarding an alleged extra-marital affair were untrue.

[21] Any exhibits to be admitted at trial must be redacted to comport with the Court's rulings.

[22] To the extent the above rulings precluding the introduction of materials referencing alleged unlawful behavior differ from those found in its earlier order addressing Defendant's motion to dismiss, the Court notes it warned the earlier rulings were subject to change upon the introduction of evidence at the summary judgment stage. (See Doc. No. 22, P. 5 n. 5). Having now reviewed such evidence in context, the Court finds no reasonable factfinder would be left with the impression Defendant was accusing Plaintiff of criminal conduct. Diez, 834 S.W.2d at 252. In other words, although his strong language clearly evidenced disapproval, Defendant did not charge Plaintiff with a specific crime in any of his communications. Id. at 253.

- 18 -

> staff. I am certain that Mr. Nishio only came to the board because this unprofessional conduct on the part of the CEO was seriously undermining Mr. Nishio's ability to run the Tokyo office. Additionally, I highly doubt that Mr. Nishio would have come to the board without strong evidence of the relationship and its effect on his office.

(Defendant's Exh. P). As held above, these statements imply the existence of undisclosed defamatory facts, and thus are not privileged as expressions of opinion. Ribaudo, 982 S.W.2d at 704.

Defendant's Motion for Summary Judgment as to the July 23, 2008, e-mail is granted in part and denied in part, in accordance with the foregoing.

### G. September 3, 2008 Republication Of Tom Nishio's Letter

Finally, on or about September 3, 2008, Defendant admittedly forwarded a verbatim copy of Tom Nishio's May 28, 2008, e-mail regarding Plaintiff's alleged affair to the USSEC leadership and other allegedly interested parties. (Defendant's Facts, ¶ 48, citing Defendant's Exh. R). Defendant maintains this communication was qualifiedly privileged, as it was, "made in good-faith upon a subject matter which the declarant has an interest or in reference to which he has a duty, to a person having a corresponding interest or duty, even though it contains matter which absent such privilege would be actionable." (Defendant's Memo in Support, P. 12; see also Allen, 2010 WL 1404179, *2 (citation omitted)).

Upon consideration, the Court will deny this portion of Defendant's Motion for Summary Judgment. Assuming Defendant can succeed in establishing the qualified privilege, Plaintiff nevertheless can overcome the privilege by proving either that Defendant made the defamatory statement in bad-faith or with actual malice, or that the statement made exceeded the requirements of the situation. Allen, 2010 WL 1404179, *3. The Court's review of Plaintiff's submissions reveals he may be able to prove malice, by demonstrating Defendant exhibited reckless disregard for the truth at the time he forwarded the communication. See Rice, 919 S.W.2d at 244 (citation omitted)

("Statements made without any factual basis satisfy the recklessness standard."). Furthermore, with his Complaint Plaintiff submitted evidence that Defendant's statement "exceed[ed] the requirements of the situation." (See Doc. No. 1-8, indicating Defendant forwarded Nishio's missive to the "entire worldwide staff"). Again, "if a fact issue is raised on the existence of good faith or malice, or on whether or not the statements made exceed the exigencies of the situation so as to constitute an abuse of the privilege, such fact questions are for the jury." Hellesen, 370 S.W.2d at 345 (citations omitted).

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 80) is **GRANTED** in part and **DENIED** in part, in accordance with the foregoing.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. No. 73) is **DENIED**.

Dated this 11th day of May, 2010.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE